# IN THE COURT OF APPEALS OF IOWA

No. 15-1139
Filed August 31, 2016

IN RE THE MARRIAGE OF MARCY LEA KERKHOFF
AND NEAL KENNETH KERKHOFF

Upon the Petition of
**MARCY LEA KERKHOFF,**
  Petitioner-Appellant/Cross-Appellee,

**And Concerning**
**NEAL KENNETH KERKHOFF,**
  Respondent-Appellee/Cross-Appellant.
_____

  Appeal from the Iowa District Court for Pottawattamie County, James Richardson, Judge.

  A wife appeals and a husband cross-appeals the economic provisions of their dissolution decree. **AFFIRMED AS MODIFIED.**

  Randall J. Shanks and Emily A. Shanks of Shanks Law Firm, Council Bluffs, for appellant.

  Shannon D. Simpson and Ryan J. Muldoon of Telpner, Peterson, Smith, Ruesch, Thomas & Simpson, L.L.P., Council Bluffs, for appellee.

  Considered by Danilson, C.J., and Vogel and Potterfield, JJ.

**POTTERFIELD, Judge.**

Marcy Kerkhoff appeals and Neal Kerkhoff cross-appeals the economic provisions of their dissolution decree. Marcy argues she is entitled to a portion of the appreciated value of gifted stock Neal received from his parents. Marcy also argues the district court incorrectly calculated Neal's income for purposes of determining the proper amount of alimony and child support payments, mistakenly believed the parties had stipulated to division of property, failed to address Neal's dissipation of marital assets, and improperly included the value of her wedding ring as a part of the marital estate. Finally, Marcy requests she be awarded attorney fees and costs of this appeal.[1] Neal argues the district court should not have awarded Marcy any spousal support, improperly established a constructive trust over his gifted stock, and abused its discretion in awarding Marcy costs and attorney fees.

## I. Background Facts and Proceedings

Marcy and Neal were married in November 1990. Marcy was twenty-two when they married; Neal was twenty-five. In September 2013, nearly twenty-three years after the parties wed, Marcy filed a petition for dissolution of marriage. During their marriage, the parties had three children together. Two of the children are now adults, and the third is sixteen years old. Both Marcy and Neal were in good health at the time of trial.

Neal is a college graduate with a business degree. Since college, Neal has undertaken a series of entrepreneurial ventures, both alone and with his

---

[1] Marcy made these final requests as part of a separate motion for fees and costs. On December 1, 2015, our Supreme Court ordered that the requests sought in the separate motion be submitted with the appeal.

father, Frank Kerkhoff, who is an accomplished businessman. Marcy attended one year of college, spent one semester at a music conservatory, and later completed a six-month certificate program in order to become a travel agent. She never worked as a travel agent. Marcy worked for approximately eight months as a salesperson at a jewelry store, eight months doing clerical and secretarial work at an employee benefits company, and one and one-half years doing secretarial work and events planning at an 800 number call center for Radisson Hotels. Then, in 1994, Marcy began working with Neal.

At first, Marcy worked for a company she and Neal co-owned. In June 1994, she and Neal moved into a senior living center—Belleview Harmony Court—developed, constructed, and operated by Neal and his father. Neal was to be the live-in resident manager of the facility. When Marcy gave birth to the couple's first child in 1994, she and Neal agreed Marcy would leave the workforce and devote herself to being a mother and homemaker. The couple moved out of Belleview Harmony Court and into their own home in July 1996. Neal and his father opened a second senior living center—Council Bluffs Harmony Court—in 1999. With the addition of the second facility, Neal was responsible for the management and operations of a combined two hundred units.

Marcy did not have official involvement in decisions involving the properties, nor did she attend corporate meetings. She did, however, assist Neal with a variety of tasks related to the facilities, including arranging holiday programs, assisting with advertising, and running errands. She also continued to

work sporadically in advertising as a model and voice-over actor. Her income from such work was neither steady nor substantial.

The parties' economic situation during the marriage was unusual. Neal was paid a salary as the administrator of the senior living centers operated by the family-owned corporations. However, the amount he earned in that manner was not indicative of the parties' standard of living. Beginning in the 1970s, Neal's parents—namely, his father Frank—began gifting shares of stock in the family corporations to Neal and his siblings in what the district court described as "a complex tax avoidance scheme." Neal's shares in the family companies are as follows: 16.66% of K.L.W. Construction, Co.—the corporation under which the senior living centers were built and operated; 21.09% of Lake City Health Services, Inc.; 15.25% of Kerkoff L.P.; and 17.4% of C.J. Millers, L.L.C. The stipulated value of Neal's interest in the corporations at the time of trial, minus a 30% reduction for lack of marketability and minority interest, was $6,295,658. Neal's father maintained complete control of all those business entities, and he controlled all related assets and distributions.

Neal and Marcy's tax returns show Neal reported as income from his position as manager of the senior living centers—where he earned minimum wage of $7.25 per hour—and a much higher figure of adjusted gross income. For example, the couple's 2009 federal tax return shows W-2 income from wages of $11,725 but an adjusted gross income of $217,329. For the following years, the couple's reported wage income versus reported adjusted gross income figures were $9369 to $199,817 in 2010; $7635 to $214,601 in 2011; $7639 to $282,239 in 2012; and $6634 to $161,580 in 2013. The difference is largely

accounted for by management fees and distributions Neal received at the discretion of his father.

Marcy argued to the district court that even these income values are understated, and the couple's true income is difficult, if not impossible, to determine. For example, according to the deposition testimony of Neal's sister, who has worked as the bookkeeper for the senior living centers since 1998, Neal was paid an additional $20,000 in consulting fees, quarterly, each year. Those payments were made to the corporation jointly owned by Neal and Marcy, and it is unclear whether those amounts were accounted for in tax paperwork. While the couple's precise financial situation may be difficult to determine, their standard of living was relatively high. The family lived in a home worth $405,000, which sat on an acreage that included a large outbuilding and motocross track. The couple owned seven vehicles,[2] and Neal owned as many as twenty motorcycles. The couple sent each of their children to private school, and the family consistently took vacations and trips.

The district court entered a temporary order on November 12, 2013, in which Neal was ordered to pay a property settlement award of $50,000 to Marcy, plus additional property settlement awards at set intervals as requested by Marcy. All such payments would be credited towards any future property settlement payable to Marcy. In total, Marcy received settlement awards totaling

---

[2] At the dissolution hearing, Neal argued the seven vehicles were not indicative of a lavish lifestyle. He testified the vehicles, along with their average trade-in values according to the Kelley Blue Book, included: (1) a 2013 Chevrolet Camaro, worth $24,448; (2) a 2013 Chevrolet Silverado, worth $32,108; (3) a 2011 Chevrolet Silverado, worth $26,124; (4) a 2007 Ford Expedition, worth $7216; (5) a 2003 Ford Windstar, worth $1814; (6) a 2001 Ford F-150, worth $4356; and (7) a 1996 Chrysler Sebring, worth $1020.

$359,488, which included the 2013 Chevrolet Camaro and half the value of the marital home.

The dissolution hearing was held on April 9 and 10, 2015. A number of issues were stipulated to by the parties prior to, during, and after the dissolution hearing. For example, the parties stipulated before the hearing Neal would retain the marital home and pay Marcy half its value, which he did in early February 2015. On April 16, 2015, the parties stipulated to a joint parenting plan in which they agreed to joint legal custody and physical care of their only minor child. The primary issues remaining at trial were: (1) the amount of child support; (2) the amount of spousal support, if any; and (3) whether Neal's gifted stock should be divided in any way. Both Marcy and Neal testified extensively, as did Frank Kerkoff. Marcy and Neal each presented experts who opined about Neal's income and the amount Neal's gifted stock had appreciated.

The district court filed its findings of fact, conclusions of law, and decree of dissolution on April 30, 2015. The court found Marcy was not entitled to any share of Neal's gifted stock. The district court also accepted Neal's expert's figure regarding Neal's net monthly income and imputed an annual income of $25,000 to Marcy based upon the fact she had marketable skills but was unemployed and had not sought full-time work during the pendency of the dissolution proceedings. The district court ordered Neal to pay for the minor child's private school tuition and medical insurance, in addition to $662.15 per month to Marcy as contribution towards support of the child. The district court also ordered him to pay Marcy $3300 per month as spousal support and to transfer to Marcy a one-time payment of $205,000—half the value of the marital

home he was awarded—although he had already transferred that amount to her. Finally, the district court ordered Neal to pay Marcy's costs and attorney fees in the amount of $108,757.08. The court's reasoning was as follows:

> At the time of this action, a great deal of distrust existed between [Marcy] and [Neal]. In no small amount, this situation existed due to the secretive methods in which Frank Kerkhoff managed the various businesses. As a result, enormous attorney fees and expert witness fees have been incurred. . . . This court specifically finds that said fees are reasonable and have been earned. Simply, the issue is who should pay these fees. This court specifically finds that equity demands that such fees follow and be assessed to the ownership of the corporate stock. The various corporate entities should be responsible for the fees incurred in this application.

To ensure Neal's fulfillment of the obligations set forth in the dissolution decree, the district court established a constructive trust, "created with the corporate stock awarded to [Neal] being the corpus thereof."

Both Marcy and Neal filed motions to enlarge or amend the district court's dissolution decree. The district court ruled on those motions on June 1, 2015.

Marcy appeals and Neal cross-appeals.

## II. Standard of Review

We review dissolution of marriage cases de novo. *In re Marriage of Schenkelberg,* 824 N.W.2d 481, 483–84 (Iowa 2012). We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but are not bound by them. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). "Prior cases are of little precedential value, except to provide a framework for analysis, and we must ultimately tailor our decision to the unique facts and circumstances before us." *In re Marriage of Kleist,* 538 N.W.2d 273, 276 (Iowa 1995).

## III. Discussion

### A. Appreciation of Stock Gifted to Neal

Iowa is an equitable distribution state. *McDermott*, 827 N.W.2d at 678. "In dissolution-of-marriage cases, marital property is to be divided equitably, considering the factors outlined in Iowa Code section 598.21[(5)]" (2013). *Id.* (citing *In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007) (alteration in original). Equitable distribution depends upon the circumstances of each case, and it does not necessarily mean equal distribution. *Hansen*, 733 N.W.2d at 702.

Property inherited by, or gifted to, either party is generally not subject to division, regardless of whether the property was inherited or gifted prior to, or during, the course of the marriage. Iowa Code § 598.21(5), (6). Nonetheless, inherited or gifted property may be divided as marital property "upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage." *Id.* We consider the following factors when determining whether it would be inequitable not to divide a gift between spouses:

> (1)  contributions of the parties toward the property, its care, preservation or improvement;
> (2)  the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3)  separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4)  any special needs of either party;
> (5)  any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*In re Marriage of Thomas*, 319 N.W.2d 209, 211 (Iowa 1982). The Iowa Supreme Court has also stated "that the length of the marriage may be an

important factor in determining whether gifted property should be included in the court's property distribution." *In re Marriage of Goodwin*, 606 N.W.2d 315, 319 (Iowa 2000).

The parties do not dispute the fact Neal's shares of stock were gifted to him by his parents. Neal's father testified that the donative intent was to transfer interests in the family's business entities to his children only and not to their spouses. However, Marcy argues the appreciation of the stock during the course of the marriage should be divided between the parties because she contributed to the family unit by raising the couple's children, she contributed to the Kerkhoff family businesses by performing assorted tasks for the benefit of the senior living facilities, and the gifted stock provided support for the family's livelihood. She asks us to modify the dissolution decree to award her $2,489,012.50—one-half of the $4,978,025 Neal's gifted stock appreciated.

We decline to modify the dissolution decree to award Marcy a share of the appreciation of Neal's gifted stock. We agree with the district court's views on this issue:

> In this case, it is abundantly clear that the donor's specific intent was . . . a gift to Neal only. . . . Marcy did not contribute towards the care, preservation or improvement of the gifted property. No close independent relationship existed between the donors and Marcy. Neither party has any special needs. The gifted property was not preserved by any separate contributions by Marcy to the parties' economic welfare. Therefore, no inequity results if Neal's gifted interest in the business enterprises is set aside to him.
> In this case, the gifted companies provided minimal support to the parties during the marriage. Frank Kerkhoff maintained complete control of the business entities which provided managerial fees and wages to [Neal] only. Thus, the real value of the gifted corporate stock was the establishment of a standard of living for the parties.

> Thus, . . . the gifted corporate stock is primarily relevant in the assessment of spousal support.

The gifted stock in the Kerkhoff family businesses never directly supplied Neal and Marcy with income or wealth. Instead, the value associated with the gifted stock resided in the income and distributions Neal received through the businesses, at the sole discretion of his father. This situation is distinguishable from the case cited by Marcy in which a panel of our court credited to both parties the appreciation of an inheritance of one party. *See In re Marriage of Kitzman*, No. 11-0441, 2012 WL 1439127, at *8 (Iowa Ct. App. Apr. 25, 2012) (where the husband's inheritance was farmland that served as a source of the family's livelihood over the course of the twenty-nine-year marriage; the wife contributed by making improvements to home, worked outside the home and deposited her paychecks into a joint account used to pay bills, had a "very close" relationship with the husband's parents, and tended to them in their later years).

### B. Neal's Annual Income

Marcy next argues the district court incorrectly determined Neal's income for use in calculating alimony and child support. She argues the district court undervalued Neal's income when it attributed to the couple a gross annual income of $165,313.01. She points to the testimony of her own expert as the most reliable source for determining the proper monthly income to be used in the court's calculations. Marcy's expert valued Neal's *net* average annual income at $169,591.33; she argues the use of her expert's income valuation should result in an increase in Neal's alimony obligation from $3300 to $8784 per month and an increase in his child support obligation from $662.15 to $1025.92 per month.

In applying the child support guidelines, the court must determine the parents' monthly income from the most reliable evidence presented. *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). "Both parents have a legal obligation to support their children, not necessarily equally but in accordance with his or her ability to pay." *Moore v. Kriegel*, 551 N.W.2d 887, 889 (Iowa Ct. App. 1996). Likewise, "[w]hen determining the appropriateness of alimony, the court must consider '(1) the earning capacity of each party; and (2) present standards of living and ability to pay balanced against relative needs of the other.'" *In re Marriage of Kurtt*, 561 N.W.2d 385, 388 (Iowa Ct. App. 1997) (citation omitted).

Although we review the district court's determinations in this matter de novo, we do grant them significant deference, particularly regarding credibility determinations. We find no error or inequity in the district court's decision to credit the income valuation of Neal's expert witness over that of Marcy's expert. Marcy's expert witness arrived at his figure by averaging income figures for three years—2011 to 2013—and admitted on cross-examination his income valuation assumed Neal realized the total income associated with his percentage interest in the Kerkhoff family companies, as opposed to the actual distributions Neal received at the direction of his father. By contrast, Neal's expert witness arrived at his income figure by averaging Neal's income over five years and taking into account the actual distributions Neal received from his father rather than the total income derived from the family businesses. We do not disturb on appeal the district court's determination the income valuation provided by Neal's expert was more reliable. Nor do we increase the district court's alimony and child support

awards. Marcy has not separately argued the district court's awards of alimony and child support are inadequate or flawed; she only argues we should increase those awards if we reassess Neal's income, which we decline to do.

## C. Division of Personal Property

In the dissolution decree, the district court ordered the parties to divide the assets and liabilities set forth in Exhibit QQ-1 as indicated therein and further ordered, "All personal property not contained in said exhibit shall be divided pursuant to the parties' stipulation entered during trial." No such stipulation was entered at trial. When this was brought to the district court's attention, the court filed a ruling granting the parties an additional twenty days in which to "execute at counsel's office all stipulations and transfer of personal property." Marcy submits the parties have still failed to resolve the outstanding issues regarding distribution of personal property and asks that we remand the case to the district court with direction the court oversee resolution of those issues. Neal has provided no response to Marcy's request.

The district court ruled on this issue in its June 1, 2015 order granting the parties twenty days to execute further stipulations regarding their minor personal property items. As the Iowa Supreme Court explained in its December 1, 2015 ruling on Neal's motion for limited remand, "remand is not needed as the district court retains jurisdiction to enforce . . . the Decree of Dissolution of Marriage." Either party may file an appropriate motion in district court to enforce the dissolution decree—a motion to initiate contempt proceedings, for example. *See* Iowa Code § 598.23(1) ("If a person against whom a temporary order or final

decree has been entered willfully disobeys the order or decree, the person may be cited and punished by the court for contempt . . . .").

## D. Neal's Dissipation of Marital Assets

Next, Marcy argues the district court improperly failed to account for Neal's dissipation of marital assets. *See In re Marriage of Kimbro*, 826 N.W.2d 696, 700–01 (Iowa 2013) (explaining a court may "generally consider a spouse's dissipation or waste of marital assets prior to dissolution when making a property distribution," and if a spouse's conduct caused the improper loss of property otherwise subject to division at time of divorce, then the wasted asset should be included in the marital estate awarded to the spouse who caused the waste). Specifically, Marcy argues the $6602.98 Neal spent hiring private investigators to follow her on trips to Texas and California constitutes an unnecessary expense and should be awarded to Neal. Neal responds by alleging it was Marcy who dissipated marital assets by travelling to Texas and California to visit her paramour and engage in an extramarital affair, and his expense in confirming her actions was necessary.

The district court did not address the issue of dissipation of marital assets in the dissolution decree. When Marcy pressed the issue in her motion to enlarge, the district court again did not specifically address it, explaining only that the court "ha[d] attempted simplicity in its decree to minimize the issues and tensions between the parties." The court then overruled and denied "all other aspects" of the parties' motions to enlarge, including Marcy's request that it find Neal dissipated marital assets. We find the district court's decisions regarding the overall division of property and awards of alimony, child support, and attorney

fees to be equitable under the circumstances of this case. Specifically, we find the language contained in the district court's June 1, 2015 ruling, combined with the language justifying the award of attorney fees to Marcy and the off-setting claims of each party regarding Marcy's travel, sufficient to settle the matter. We affirm the district court's rejection of Marcy's claim for credit for the private investigator's fees.

### E. Marcy's Wedding Ring

Marcy argues her wedding ring, valued at $6100, was improperly considered a marital asset by the district court. *See Fierro v. Hoel*, 465 N.W.2d 669, 672 (Iowa Ct. App. 1990) ("[A]n engagement ring given in contemplation of marriage is an impliedly conditional gift; it is a completed gift . . . upon marriage."). Neal does not now dispute the wedding ring was a gift given to Marcy and should not be considered a marital asset.[3] The district court rejected Marcy's claim in the context of its overall division of property. Marcy was awarded ongoing alimony payments and child support payments, and she has already received settlement awards totaling more than $350,000. We do not believe the district court's mistaken classification of the wedding ring as marital property results in an inequitable distribution.

### F. Award of Spousal Support and Amount of Child Support

Neal argues the district court erred in awarding alimony to Marcy. In support of his argument, Neal argues he already paid Marcy an overage of $43,432.64 in the property division and the evidence presented at trial shows Marcy is capable of sustaining the standard of living she enjoyed during the

---

[3] We note Neal's proposed division of property included the ring as a marital asset.

marriage. Neal argues the parties lived "a very modest lifestyle for the duration of the marriage," and Marcy is "a fully capable, young, and very talented woman" who earns a minimum of $100 per hour for voiceover and modeling work and has a "thriving musical career."

When determining whether an award of alimony is appropriate under the facts of a particular case, we accord the district court considerable latitude and only disturb the ruling when there has been a failure to do equity. *See In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005). Traditional alimony, like the district court awarded to Marcy in this case, is "payable for life so long as a spouse is incapable of self-support." *See id.* at 316 (citing *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989)). Typically, this means the alimony is payable until the death of either party, the payee's remarriage, or until the payee is capable of self-support at the lifestyle to which he or she was accustomed during the marriage. *In re Marriage of Gust*, 858 N.W.2d 402, 412 (Iowa 2015). Traditional alimony works to assure equity in dissolutions of long-term marriages, where "life patterns have largely been set, [and] the earning potential of both parties can be predicted with some reliability." *Francis*, 442 N.W.2d at 62–63. "Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional [alimony]." *Gust*, 858 N.W.2d at 410–11.

We disagree with Neal's contention the district court wrongly awarded Marcy alimony. The district court accepted Neal's exhibit regarding property division, including the substantial reduction of $220,000 he claimed for money owed to his father for attorney fees. His claim he paid Marcy an excess of

$43,432.64 in the property division is belied by his exhibit. In accepting Neal's exhibit as an accurate depiction of the parties' assets and liabilities, the district court specifically listed the promissory note as an exception.

Second, we do not agree with Neal's assertion Marcy has a thriving music career and is capable of maintaining the standard of living she enjoyed during the marriage. Other than sporadic modeling and voiceover work, Marcy has not worked outside the home in any meaningful way in more than twenty years. She has no history of earning income sufficient to support herself, and she is tasked with reentering the workforce more than two decades after she left it. She does not have a college degree. We find no inequity in the district court's award of alimony to Marcy, particularly given the fact it imputed yearly income of $25,000 to Marcy in determining the amount to be paid.

Nor do we find inequity in the district court's calculation of child support using Neal's pre-alimony income figures. Neal argues his alimony payments to Marcy should be reflected in the parties' respective incomes used to calculate his child support payments.[4] Viewing the district court's dissolution decree as a whole, and given the fact the district court already deviated downward from the Iowa Supreme Court guidelines in order to account for Neal's payment of the remainder of the child's private schooling, we see no inequity in the amount of child support awarded to Marcy.

---

[4] Marcy filed a motion to strike this portion of Neal's brief, arguing he improperly added it to his proof brief after the filing deadline had passed. Our Supreme Court denied the motion to strike. Marcy reiterates her argument on appeal. We find no error with allowing Neal's amendment to his proof brief. Iowa Rule of Appellate Procedure 6.901(6) provides, "An appellee's brief may be amended once within 10 days after service, provided no brief has been served in reply to it."

### G. Constructive Trust on Neal's Gifted Stock

Neal also argues the district court improperly created a constructive trust consisting of his gifted shares of stock.[5] He argued in his motion to enlarge that the trust should not continue during his obligations to pay child support and alimony. We agree. "A constructive trust is a remedy, applied for purposes of restitution, to prevent unjust enrichment." *Slocum v. Hammond*, 346 N.W.2d 485, 493 (Iowa 1984). "It is an equitable doctrine." *Id.* Constructive trusts fall into three categories: "first, trusts that arise from actual fraud; second, trusts that arise from constructive fraud; [and] third, trusts that arise from some equitable principle independent of the existence of any fraud." *Loschen v. Clark*, 127 N.W.2d 600, 603 (Iowa 1964). Upon our de novo review of the record, it appears the substantial property settlement awards Neal paid to Marcy prior to the dissolution hearing resolve most, if not all, of his immediate obligations under the dissolution decree. The ongoing alimony payments Neal owes to Marcy, which could continue until the death of one of the parties if Marcy does not remarry, are not linked directly to the gifted stock but rather to Neal's income, management fees, and the distributions overseen by Frank. Any outstanding issues regarding the parties' marital property is similarly unconnected to the stock. Therefore, we believe the purpose for the constructive trust has been satisfied and limit the constructive trust established by the dissolution decree to Neal's one-time obligations. The trust shall no longer be in effect when those obligations have

---

[5] Marcy also filed a motion to strike this portion of Neal's brief. We consider her objections as we did above and find no issue.

been satisfied, leaving Neal with his periodic obligations for alimony and child support.

### H.  Attorney Fees and Costs

Finally, both parties make arguments related to attorney fees and costs. On cross-appeal, Neal argues the district court abused its discretion in awarding Marcy attorney fees in the dissolution decree.  "Trial courts have considerable discretion in awarding attorney fees." *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994).  "Whether attorney fees should be awarded depends on the respective abilities of the parties to pay," and any fees awarded "must be fair and reasonable." *Id.*  As explained by the district court, the high amount of attorney fees involved in this dissolution was necessitated by the opaque nature of Neal's stock holdings and income and was earned by counsel.  The court accounted for Neal's attorney fees, as represented by his promissory note to his father, in the property division. We find no abuse of discretion by the district court in awarding Marcy attorney fees and costs in the amount of $108,757.08.

Marcy argues we should also award her attorney fees and costs on appeal, in the amount of $22,672.  "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion."  *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).  Whether appellate attorney fees should be awarded depends upon factors which include "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993).  We have considered those factors and decline to grant appellate attorney fees.  Costs shall be taxed equally to both parties.

**IV. Conclusion**

For the reasons discussed above, we find the constructive trust created by the district court using Neal's gifted stock as the corpus shall no longer be in effect. We otherwise affirm the dissolution decree. We decline to award Marcy appellate attorney fees and tax costs to both parties equally.

**AFFIRMED AS MODIFIED.**

Vogel, J., concurs; Danilson, C.J., dissents.

**DANILSON, Chief Judge (dissenting)**

I respectfully dissent. This case exemplifies the difficulty courts have in dealing with appreciation of separate property. In this case, Neal was gifted corporate stock by his father both before and during the course of this twenty-four year marriage. During the marriage, the stock appreciated to the tune of $4,978,025. The district court and the majority concluded that Marcy was not entitled to share in any of the appreciation. Although the stock was gifted solely to Neal, I believe this result is contrary to our case law, the principles in Iowa Code section 598.21, and is inequitable.

The division of appreciation of separate property is a troublesome issue throughout the country. The states are not uniform in their approach to appreciation arising from separate property, and both chaotic and inconsistent results arise in attempting to draw lines based upon the amount and type of contributions each party has made to account for the appreciation. *See* Sheila A. Bentzen, "What's Mine Is Yours . . . Sometimes: Solving the Puzzle of Nebraska's Approach to Allocation of Income and Appreciation From Separate Nonmarital Property." 47 Creighton L. Rev. 37 (December 2013).

First, it is significant to realize the issue in dispute is the appreciation of gifted stock and not the original gift. Our supreme court aptly recited all the principles, including statutory authority, in considering if gifted property can and should be divided in *In re Marriage of McDermott*, 827 N.W.2d 671, 678-83 (Iowa 2013). But here, Marcy does not seek an award of Neal's gift of corporate stock; she only seeks a division of the appreciation of the value of the stock that arose during the marriage.

Our supreme court similarly faced a property division dispute involving substantially appreciated gifted stock in *In re Marriage of Friedman*, 466 N.W.2d 689 (Iowa 1991). In *Freidman*, our supreme court concluded the appreciation was a marital asset and stated,

> We have previously dealt with the question of appreciated stock value in our case law. The court of appeals included in its property division the appreciated value of stock in *In re Marriage of Wallace*, 315 N.W.2d 827 (Iowa Ct. App.1981). Our court approved this language from *Wallace*:
>
>> [A]s time goes on, the benefits of such property are enjoyed by the married couple; it is both natural and proper for the expectations of the other spouse to rise accordingly. A sudden substantial rise in the couple's standard of living made possible by a gift or inheritance to the husband or the wife will naturally and reasonably lead the other spouse to anticipate that that standard of living will be maintained, particularly if it is sustained over a lengthy period of time. . . . With time such changes become ever more deeply ingrained, and eventually it becomes virtually impossible to return to a world long since renounced and forgotten.
>
> [*In re Marriage of*] *Muelhaupt*, 439 N.W.2d [656], 659 (Iowa 1989)]; *see also In re Marriage of Lattig*, 318 N.W.2d 811 (Iowa Ct. App. 1982). Other courts have also divided the appreciated value of assets even when separately held where the increase resulted from the talent, time and effort of the marital partners. *See generally In re Marriage of Lee*, 430 N.E.2d 1030, 1031 (Ill. 1981); *In re Marriage of Scott*, 407 N.E.2d 1045, 1048 (Ill. 1980). In the case at bar we feel it is equitable to treat the appreciated value of the stock that we have deemed a marital asset in the same manner as the unappreciated values. In *Locke v. Locke*, 246 N.W.2d 246, [251] (Iowa 1976), we pointed out that there need be neither an equal division nor a percentage division of the property, saying "that which is determinative is that which would constitute an equitable and just award under the circumstances."

466 N.W.2d at 692-93. Ultimately in *Friedman*, the spouse was awarded forty percent of both the gifted value and the appreciation that had accumulated in a twenty-four-year marriage. *Id.* at 693.

Appreciation was also identified as "marital property" in *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995), where the court stated, "Decisions on how to use property during the marriage, including inherited property, bear most of the characteristics of a family decision. Barring special circumstances not present here, we believe that the resulting appreciation or loss may be characterized as marital property." In *White*, the supreme court also stated that where inherited property "does not change its form following its receipt" there is some merit that the appreciation should be awarded to the same person who is entitled to the separate property. 537 N.W.2d at 746. However, in *White* the inherited property was no longer in the same form and had been used to buy other property. *Id.* Thus, the court never reached the issue of whether inherited property that does not change its form but appreciates in value should be awarded to the same spouse who inherited it, nor was consideration given to the efforts or contributions of the parties as prior cases had suggested.

Subsequent to *White*, the court faced the issue of whether appreciation of premarital property was subject to division in *In re Marriage of Fennelly*, 737 N.W.2d 97 (Iowa 2007). Although premarital property is not separate property as is gifted and inherited property, the principles of *Fennelly* took a new step in viewing or weighing the efforts and contributions of the parties. In *Fennelly*, the parties did not dispute setting aside the premarital property—corporate stock—to the party who had brought the property into the marriage, but challenged the distribution of the appreciation of the premarital property. 737 N.W.2d at 103. The stock had appreciated fortuitously and the family home appreciated at least in part by the contributions of both parties. *Id.* The court stated, "We do not find

the parties' respective contributions to the marriage justify treating the parties differently." *Id.* The court went on to explain,

> It is important to remember marriage does not come with a ledger. Spouses agree to accept one another "for better or worse." Each person's total contributions to the marriage cannot be reduced to a dollar amount. Many contributions are incapable of calculation, such as love, support, and companionship. "Financial matters . . . must not be emphasized over the other contributions made to a marriage in determining an equitable distribution."
>
> In the present case, both parties contributed in countless ways to the marriage. Both worked outside the home, cooked, cleaned and looked after the children. We presume they found solace in one another, at least in the earlier years of their marriage. Although each party's contribution to a marriage is an appropriate factor affecting property division, it is not "useful to analyze the exact duties performed by the marriage partners." Suffice it to say, neither party shirked his or her duties so as to justify disparate treatment.
>
> Nor do we find it appropriate when dividing property to emphasize *how* each asset appreciated—fortuitously versus laboriously—when the parties have been married for nearly fifteen years. Property may be "marital" or "premarital," but it is all subject to division except   for gifts and inherited property. Iowa Code § 598.21(1).

*Id.* at 103–04 (case citations omitted). *Fennelly* does not eliminate consideration of contributions as a factor in property distribution. *See* Iowa Code § 598.21(5)(c). Evidence of a non-contributing spouse or one who has "shirked their duties" may not be entitled to an equal distribution. But contributions to the marriage can support an equal or nearly equal treatment in the property distribution. We also no longer need to consider "how each asset appreciated—fortuitously versus laboriously—" in a marriage of about fifteen years or longer. *Fennelly*, 737 N.W.2d at 104.

The principles set forth in *Fennelly* provide a sound basis to apply to the appreciation of any asset, premarital, marital, or separate gifted or inherited

property in a long-term marriage. The reasoning in both *Friedman* and *Wallace* support its application to both gifted and inherited property. The facts in this case, as in *Friedman* and *Wallace*, reflect that appreciation may well far exceed the value of the initial gift or inheritance.

Applying the *Fennelly* principles to appreciation of gifted or inherited property in a long-term marriage is not only equitable but avoids the difficulty encountered in weighing the contributions made by each party so long as neither "shirked their duties." *See id.* at 103-04. At the same time, the initial gift or inheritance can be awarded to the recipient as required by Iowa Code section 598.21(6). Our court has chosen to follow this path in numerous prior cases. *See, e.g.*, *In re Marriage of Hansen*, No. 15-1825, 2016 WL 4036182, at *3 (Iowa Ct. App. July 27, 2016); *In re Marriage of Klingman*, No. 11-1839, 2013 WL 541622, at *3-5 (Iowa Ct. App. Feb. 13, 2013); *In re Marriage of Kinser*, No. 11-0169, 2012 WL 3194088, at *8 (Iowa Ct. App. Aug. 8, 2012); *In re Marriage of Antoine*, No. 09-1653, 2010 WL 5023072, at *7-8 (Iowa Ct. App. Dec. 8, 2010).

Even if we tread into the deep waters of weighing the contributions in this case, here, Neal was actively involved in the corporate business and the family relied upon the income and dividends from the corporation. While Neal was benefiting the corporation by his services, Marcy provided other contributions such as serving as a stay-at-home mom. Marcy was the consummate mother. She attended all the school conferences, chaperoned activities, made all the school lunches, assisted in some coaching duties, made costumes, transported the children to their frequent activities, assisted in 4-H projects, planned all vacations, and stayed home when a child was ill. And for one of the enterprises

run by Neal's family, the district court noted she "assisted in running errands, entertaining residents, and promotion work."

Both the district court and the majority contend the gifts never significantly improved the parties' lifestyle. I acknowledge the oft-cited principle that a spouse's lifestyle may be consideration in dividing a gift if, for example, the gift substantially increased the parties' standard of living. *See Muelhaupt*, 439 N.W.2d at 659; *Wallace*, 315 N.W.2d at 833. Although such a consideration seems reasonable, it fails to take into account the spouse who lives a conservative lifestyle to preserve assets or build-up a nest egg in expectation that assets eventually will be available to provide for the family needs or to pass on to loved ones. Marcy may not have lived a lifestyle typical of the parties' net worth but their house was paid; the children attended private schools; there was no family debt; they had seven vehicles, about twenty motorcycles, and a huge outdoor building; and they took "nice" vacations. The fact that Neal and Marcy lived a conservative lifestyle in light of their net worth should not impact the division of their property.

I would remand and require the stock appreciation to be divided equally, and in so doing, no award of alimony would be necessary because Marcy would have the benefit of either an equal amount of dividends as Neal, or if her share was paid by an equalization payment, she would have sufficient assets to support herself. I would also remand for a determination of how Marcy's share should be paid or distributed, recalculation of child support, and determination of the allocation of personal property—which apparently had not yet been completed.