# IN THE COURT OF APPEALS OF IOWA

No. 23-0219
Filed August 7, 2024

**IN RE THE MARRIAGE OF HEATHER JO BAEDKE
AND JON MICHAEL BAEDKE**

**Upon the Petition of
HEATHER JO BAEDKE,**
        Petitioner-Appellee/Cross-Appellant,

**And Concerning
JON MICHAEL BAEDKE,**
        Respondent-Appellant/Cross-Appellee.

_____

        Appeal from the Iowa District Court for Webster County, Christopher C.

Polking, Judge.

        Both parties appeal the decree dissolving their marriage, challenging the

spousal-support award and the property division, respectively. **AFFIRMED ON**

**APPEAL AND CROSS-APPEAL.**

        Brian J. Humke and Logan J. Eliasen of Nyemaster Goode, P.C., Ames, for

appellant.

        Vicki R. Copeland of Copeland Law Firm, P.L.L.C., Jefferson, for appellee.

        Considered by Buller, P.J., Langholz, J., and Bower, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**LANGHOLZ, Judge.**

Jon and Heather Baedke both appeal the decree dissolving their twenty-two-year marriage. Jon challenges the spousal-support award, arguing that the amount is inequitable, mainly because the parties' respective earning capacities do not support the award. Heather challenges the property division, arguing that the court improperly valued their closely held business by including a ten-percent marketability discount and that the court failed to award interest from the date of the decree on the five annual equalization payments.

But on our de novo review, giving the court's decision the deference it deserves, we cannot say the spousal support fails to do equity. The court's valuation of the business, including the marketability discount, was within the range of permissible evidence. And neither equity nor Iowa law requires interest on installment equalization payments to begin accruing on the date of the decree. We thus affirm on both the appeal and cross-appeal. And we decline Heather's request for appellate attorney fees.

## I.    Background Facts and Proceedings

Heather and Jon married in 2000. They share two children, who are now both adults. And their family enjoyed a financially prosperous marriage.

Originally, the parties both worked at Jon's parents' apple orchard near Fort Dodge. Heather soon began a full-time job selling gourmet foods and gift wear to gift shops, wineries, and other retail stores, while Jon stayed at the orchard. They eventually started a side landscaping business. And then in 2004, they bought a lawn-care business. Jon quit his job at the orchard to work at their new combined business—Smitty's Lawn and Landscape. And Heather joined him four years later.

Smitty's continued to grow, acquiring a retail greenhouse and employing up to thirty employees seasonally. It was the only greenhouse in Fort Dodge and both parties attested to the high volume of work done by the business. Their operations included a full retail garden center, selling trees, shrubs, other plants, and garden accessories. They also provided landscaping, gardening, and lawn-care services.

Heather performed many duties for Smitty's, ranging from manual labor to customer service and administrative support. Some of her administrative duties included marketing, bookkeeping, processing payroll and billing, running accounts receivable, and managing the office.

Through the success of their business, Jon and Heather became more financially stable and comfortable. The parties built a new home in 2017 and purchased a second home in Spirit Lake around the same time. Smitty's paid for about $50,000 worth of landscaping at their home and many of their extensive home improvements at the lake house. The couple had new cars, a boat, jet skis, and vacationed in Florida and Mexico. Again, many of these expenditures, including cell phone bills, car payments and insurance, gasoline, house care, country club fees, credit card charges, and retirement account contributions, were paid for and deducted as business expenses by Smitty's. The parties did not abide by a budget and used their company's capital as they needed.

The parties separated around Christmas 2019. And Heather petitioned for dissolution in September 2021. Heather remained employed by Smitty's even after the separation. But in March or April 2022, Jon had relocated Heather's office, changed the bookkeeping system to something unfamiliar to her, denied her

access to the business' financial information, and hired an outside firm to perform her bookkeeping responsibilities.

Heather looked for new work in various industries in and around Fort Dodge. She believed she could not be a bookkeeper since she was "not qualified" for the technology-skills requirements. She explored seasonal retail positions. She also applied to be a caretaker of children or older adults but heard no response. She wanted to enroll in a yoga instructor course, but Jon was unwilling to pay the course fee. Heather estimated at trial that the best rate she could earn with her skillset and no further training would be around $15.00 per hour.

In November 2022, after a two-day trial the same month, the district court issued the dissolution decree, which was later clarified in part in a ruling on the parties' dueling reconsideration motions under Iowa Rule of Civil Procedure 1.904. The court awarded Heather traditional spousal support of $8000 per month until either party dies or she remarries. In doing so, it rejected both Heather's request for $16,500 per month and Jon's request for $1500 per month for the first five years and then $1000 per month until Heather turns sixty-seven.

To equitably divide the marital property, the court resolved many disputes about the valuation of the property. As relevant here, in valuing the parties' closely held business, it agreed with Jon's expert witness and applied a ten-percent marketability discount. And based on this valuation and the total property division, which awarded the business to Jon, the court awarded Heather five equalization payments of $56,360.44, due annually from January 1, 2023 until January 1, 2027. The court rejected Heather's request to also award interest on those amounts

accruing from the date of the decree. Instead, it clarified that statutory interest would only begin "to accrue on any installment not timely paid."

Jon now appeals. And Heather cross-appeals.

## II.     Spousal Support

We review a district court's spousal-support award de novo. *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023). But we give deference to the district court's "important, but often conjectural, judgment calls" in deciding an equitable award and must not engage in "undue tinkering" on appeal. *Id*. at 182–83 (cleaned up). So we will "disturb the district court's determination of spousal support only when there has been a failure to do equity." *Id.* at 182 (cleaned up).

"Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case." *Id.* at 185 (cleaned up). And to decide what is equitable, we must consider the statutory factors under Iowa Code section 598.21A(1) (2022). *See id.*

The district court awarded Heather only one of the four forms of spousal support recognized by our supreme court: traditional spousal support. Such support "is equitable in marriages of long duration to allow the recipient spouse to maintain the lifestyle to which he or she became accustomed." *Id.* And when deciding an equitable amount of traditional spousal support, the court must consider the earning capacity of each spouse, their current standards of living, and the spouse's ability to pay weighed against the relative needs of the other spouse. *See In re Marriage of Hitchcock*, 309 N.W.2d 432, 436–37 (Iowa 1981).

Given their twenty-two-year marriage, Jon does not dispute that it is equitable for Heather to receive some traditional spousal support or that it should

continue until either of them dies or Heather remarries. His only challenge on appeal is to the amount of the award. Rather than the $8000 per month awarded by the court, he argues that he should only pay $1500 per month for the first five years and then $1000 per month thereafter. He mainly takes issue with the court's assessment of the parties' respective earning capacities—contending that the court overvalued his earning capacity by including the business funds used on their marital expenses and undervalued Heather's capacity by believing her testimony on her limited employment options.

But we agree with the district court's assessment of the parties' earning capacities. Because Jon is the owner of a successful closely held business, he has practical control of whether the business's available funds are allocated to his salary, taken as dividends, put towards paying his personal expenses through the business, or retained as cash or for other business purposes. Thus, especially given the past extensive commingling of personal and business expenses, it would be inaccurate—and inequitable—to consider only Jon's salary income when considering his capacity to pay spousal support. *Cf. In re Marriage of Wade*, 780 N.W.2d 563, 566–68 (Iowa Ct. App. 2010) (concluding that equity requires consideration of corporate owner's payment of "many normal personal living expenses through the corporation" when deciding whether to deviate from child-support guidelines). The district court carefully analyzed the financial evidence to determine that Jon's earning capacity was about $243,000. We see no reason to disagree with this well-supported fact-finding.

As for Heather, while she had not found a new job by the time of trial, the district court found that she could reasonably be expected to work in "retail,

caregiving, or office work in the $15 per hour range," resulting in an annual full-time salary of $31,200. In making this finding, it considered the testimony of Jon's expert witness that Heather could earn $45,000 as a bookkeeper but reasoned that "the preponderance of the evidence would support Heather's assertion that she was never formally trained in bookkeeping, and is not up to date on the programs and technology in common use." Indeed, it gave particular weight to the evidence that "Jon found her bookkeeping to be unsatisfactory, such that he replaced her in that position." Considering the evidence anew, with deference to the district court's "front-row seat to the live testimony," we agree with these findings as well. *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024).

What's more, even if we agreed with Jon's argument that Heather's earning capacity should be $45,000, that $13,800 difference would not make the spousal-support award inequitable. Heather would still be far from a similar standard of living as during the marriage and the standard that Jon would maintain. And Jon's proposed award of $1500 or $1000 per month—or $12,000 to $18,000 per year—would do little to close either gap. In sum, the parties' respective earning capacities support—rather than undermine—a conclusion that the award achieves equity.

Jon also argues that the award "does not reflect the life patterns set during the marriage" and overlooks "whether those life patterns are sustainable." But the record is full of evidence that the parties lived a comfortable lifestyle supported financially by their business for some time—even before their spending exploded. And the court recognized they "will need to tone down their prodigious spending post-divorce." Indeed, the court rejected Heather's argument that it was sustainable for Jon to pay $16,500 per month to support that lavish lifestyle. We

see no reason to disagree with the court's judgment that an $8000 award appropriately balances Heather's needs and current standard of living against Jon's ability to pay. The spousal-support award is equitable. We thus affirm.

### III.    Property Division

Heather cross-appeals, challenging two narrow aspects of the district court's property division. First, she argues that the district court improperly valued their business by applying a ten-percent marketability discount. Second, she contends that the court erred in failing to award interest from the date of the decree on the five annual $56,360.44 equalization payments owed to her.

In a dissolution decree, "[t]he court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties." Iowa Code § 598.21(5). We review the district court's division of property de novo. *See In re Marriage of Kimbro*, 826 N.W.2d 696, 698 (Iowa 2013). But we will only modify the district court's division on appeal "when there has been a failure to do equity." *Id.* at 698 (cleaned up). And "[o]rdinarily, a trial court's valuation" of marriage property "will not be disturbed when it is within the range of permissible evidence," especially "when valuations are accompanied by supporting credibility findings or corroborating evidence." *In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007).

*Marketability Discount in Valuation of the Business.* At trial, both parties presented expert testimony about the proper valuation of their closely held business. Jon's expert included a ten-percent marketability discount in his valuation as is "normal" for a privately held business "because you cannot turn the value of the company into cash in three business days like you can—if you had a

$700,000 investment on stocks and bonds." The expert explained that the discount is "almost always applied, and that discount many times is maybe 20 percent, depending on the business" or "may be higher." And he clarified that the discount also covered the transaction costs of having to sell a private business but included no discount for lack of control or being a minority shareholder.

Heather's expert disagreed. He opined that the marketability discount was inappropriate because the business was "100 percent owned" by the parties and profitable. But on cross-examination, he conceded that the ten-percent discount is "conservative" for a marketability discount. Based on all this expert testimony, the district court found that applying a ten-percent "marketability discount was a conservative and proper discount to apply in the valuation of the business."

Heather now continues to argue that applying the discount is inequitable because "[a] marketability discount should not be applied when valuing a corporation and its assets when the two litigants own all of the stock and only one party is awarded all of the parties' ownership interest in the business." But while her expert took this position, given the contrary opinion of Jon's expert, the district court's valuation with the discount is within the permissible range of evidence.

Applying the discount also tracks with Iowa precedent that has affirmed discounting the valuation of a closely held business or its stock in a property division when there is no ready market. *See In re Marriage of Muelhaupt*, 439 N.W.2d 656, 660 (Iowa 1989). And that precedent has included cases in which the parties owned all of the closely held business. *See, e.g.*, *In re Marriage of Frett*, No. 03-1305, 2004 WL 1073989, at *3 (Iowa Ct. App. May 14, 2004) (affirming valuation with ten-percent marketability discount where party awarded

the business was sole shareholder).  Of course, the related discount for being only a minority shareholder could not apply when only the litigants own the business.  But the two discounts are distinct even if they sometimes arise together.  *See Muelhaupt*, 439 N.W.2d at 660 (affirming valuation discount of "twenty percent because it is minority stock and another twenty percent because it has no ready market"); *In re Marriage of Friest*, No. 18-0337, 2019 WL 1300881, at *9 (Iowa Ct. App. Mar. 20, 2019) (affirming combined discount of thirty percent for both "lack of marketability and lack of control").

What's more, as both experts agreed, the "conservative" ten-percent discount is lower than other marketability discounts our courts have affirmed.  *See In re Marriage of Wiedemann*, 402 N.W.2d 744, 746–48 (Iowa 1987) (twenty percent); *Muelhaupt*, 439 N.W.2d at 660 (same).  And we are mindful that given the difficulty of valuing a closely held business with any precision, "the law provides much leeway to the trial court."  *In re Marriage of Steele*, 502 N.W.2d 18, 21 (Iowa Ct. App. 1993).  So on this record, we decline to disturb the district court's valuation of the parties' closely held business with the ten-percent marketability discount.

*Interest on Equalization Payments.*  The district court ordered Jon to make his equalization payments in five annual installments of $56,360.44.  And the court ordered that statutory interest would begin "to accrue on any installment not timely paid."  But it rejected Heather's request to award interest on each payment from the date of the decree.

On appeal, Heather again argues that the court had to award interest on the total amount of the five annual equalization payments beginning from the date of the decree.  And true, statutory "[i]nterest shall be allowed on all money due on

judgments and decrees of courts." Iowa Code § 535.3(1)(a). But that statute only applies to "money due." *Id.*; *see also Hunt v. Kinney*, 478 N.W.2d 624, 625–26 (Iowa 1991) (interpreting earlier version of statute with the same relevant language, in the context of a dissolution decree's property award, to hold "that interest would not be payable from the date of the decree but only from the date that the judgment became due"). So because the annual equalization payments did not become due until each following year, the statute does not require interest to be included from the date of the decree.

Still, a court should consider whether equity requires the amount due on a delayed equalization payment to factor in interest. *Compare In re Marriage of Briggs*, 225 N.W.2d 911, 913 (Iowa 1975) (affirming equalization payments paid over eleven years without interest arising out of award of family farm when court considered lack of interest in its property division), *with In re Marriage of Conley*, 284 N.W.2d 220, 224 (Iowa 1979) (reversing refusal to award interest on equalization payments arising out of award of investment property); *see also In re Marriage of Mack*, No. 17-1568, 2018 WL 4360947, at *8 (Iowa Ct. App. Sept. 12, 2018) (affirming equalization payments without interest as equitable "because the business [awarded to the other party] is not guaranteed to increase in value—it depends upon [the other party's] work to keep it profitable" and permits payment "in a reasonable time without having to sell the property or business").

The district court did so in response to Heather's request, relying in part on our affirmance of the equalization-payment award without interest in *Mack*. *See Mack*, 2018 WL 4360947, at *8. We agree that equity does not require an increase to the equalization payments. And so, we affirm the district court's decision that

statutory interest will only begin to accrue on an equalization payment if Jon fails to make it by its due date.

## IV.    Appellate Attorney Fees

Finally, Heather asks for an award of appellate attorney fees.  We have discretion whether to award appellate attorney fees in a dissolution proceeding—they "are not a matter of right."  *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006) (cleaned up).  In exercising that discretion, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."  *Id.* (cleaned up).  Here, considering that both parties unsuccessfully appealed and their relative financial circumstances after the property division and spousal-support awards, we decline to award appellate attorney fees to Heather.

**AFFIRMED ON APPEAL AND CROSS-APPEAL.**